UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

5 GUYS MANAGEMENT, INC.,

     Plaintiff,

                               Case No. 1:24-cv-1297

v.

                               Hon. Hala Y. Jarbou

GREAT LAKES HOLISTICS
MUSKEGON, INC., et al.,

     Defendants.
_____/

## **OPINION**

In 2022, 5 Guys Management, Inc., sought to invest $1.5 million in a marijuana dispensary in Muskegon, Michigan.  5 Guys negotiated an investment deal with Defendants Alex Leonowicz and Christopher Fanta, who were corporate officers of Defendant Redbud Roots, Inc. ("Redbud"), a part-owner of the Muskegon dispensary.  The dispensary ultimately proved financially unsuccessful and 5 Guys lost most of its investment.  5 Guys subsequently brought this lawsuit against Redbud, Leonowicz, Fanta, and Redbud Roots Lab VIII, Inc. ("Lab VIII"), a subsidiary of Redbud.[1]  5 Guys brings claims for securities fraud under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j, and Rule 10b-5 of the associated regulations, 17 C.F.R. § 240.10b-5 (2025) (Count I); securities fraud under the Michigan Uniform Securities Act (MUSA), Mich. Comp. Laws §§ 451.2101–2703 (Count II); fraudulent misrepresentation and concealment (Count III); silent fraud (Count IV); innocent misrepresentation (Count V); breach of

---

[1] Three former defendants—Great Lakes Holistics Muskegon, Inc., Great Lakes Holistics, LLC, and Jacob Ownbey— have been dismissed by stipulation of the parties (ECF No. 26).

fiduciary duty (Count VIII); minority shareholder oppression (Count IX);[2] common law conversion (Count X); and statutory conversion (Count XI).[3]

Defendants all move for summary judgment (ECF Nos. 69, 73, 76).  The Court ordered additional briefing, now completed, on the application of the contractual-illegality doctrine to this case.  For the reasons explained below, the Court will grant in part and deny in part Defendants' motions for summary judgment.  Specifically, the Court will grant summary judgment to Lab VIII on all counts and dismiss it from the case; grant summary judgment to all Defendants on 5 Guys' claims for innocent misrepresentation (Count V), breach of fiduciary duty (Count VIII), minority shareholder oppression (Count IX), common law conversion (Count X), and statutory conversion (Count XI); and grant summary judgment to Redbud on 5 Guys' claims for fraudulent misrepresentation (Count III) and silent fraud (Count IV).  The Court will deny summary judgment on all other counts.

## I. FACTUAL BACKGROUND

Plaintiff 5 Guys is an Illinois corporation owned by five investors: Manish Pandya, Ovais Mahmood, Darshan Patel, Harsh Patel, and Shivam Patel.  (H. Patel Dep. 13–14, ECF No. 103-11.[4])  Defendant Redbud is a Michigan corporation founded by Dave Murray, James Finley, and Defendants Fanta and Leonowicz.  (Fanta Dep. 11, ECF No. 103-1;[5] Murray Dep. 35, ECF No. 103-3; Consent of Directors, ECF No. 103-30, PageID.4350.)  The four founders formed Redbud's Board of Directors from 2021 to 2023.  Fanta was Vice President and Chief Development Officer, and Leonowicz was Vice President, Chief Operating Officer, and General

---

[2] Counts VIII and IX are brought against the individual Defendants only.

[3] Counts VI and VII have been dismissed via stipulation (ECF No. 26).

[4] Additional excerpts of this deposition are available at ECF No. 80-7.

[5] Additional excerpts of this deposition are available at ECF No. 85-8.

Counsel.  (Consent of Directors, PageID.4350.)  Fanta's role was to bring in investors and locate real estate for dispensaries.  (Fanta Dep. 11.)  Leonowicz ran the legal department.  (*Id.* at 12–13.)

In 2022, Redbud operated a licensed marijuana dispensary in Muskegon, Michigan.  (*Id.* at 54–55.)  The dispensary was not doing well financially.  (*Id.* at 35, 38.)  In May of 2022, Redbud formed an agreement with Jacob Ownbey, the CEO of Great Lakes Holistics, LLC (GLH), under which Redbud and GLH would each own 50% of the Muskegon location.  (5/23/2022 Leonowicz email, ECF No. 103-31, PageID.4357; Fanta Dep. 97–98.)  Ownbey would manage and fund the dispensary, and Redbud would transfer Lab VIII's marijuana license to the new joint venture, GLH Muskegon ("GLHM").  (5/23/2022 Leonowicz email, PageID.4357.)

On May 2, 2022, Fanta texted Pandya about 5 Guys potentially investing in a marijuana dispensary.  (Fanta Texts, ECF No. 69-8, PageID.673.)  Pandya, Mahmood, and Darshan Patel subsequently met with Fanta for a tour of the Muskegon dispensary.  (*See* Fanta Dep. 56; Pandya Dep. 23–24, ECF No. 103-9.[6])  Fanta portrayed the Muskegon dispensary as a "new one opening up" (Mahmood Dep. 32, ECF No. 103-10[7]), omitting the fact that the dispensary had already been operating for some time before Ownbey took over.[8]  Fanta explained that 5 Guys' "money was going to go to the equipment and the product" for the Muskegon dispensary, and might be used to expand the store.  (*Id.*; D. Patel Dep. 36–37, ECF No. 103-12;[9] Fanta Dep. 73.)  5 Guys alleges that these statements turned out to be false because its investment never went to the Muskegon dispensary.

---

[6] Additional excerpts of this deposition are available at ECF No. 80-5.

[7] Additional excerpts of this deposition are available at ECF No. 80-6.

[8] Although the investors visited the Muskegon dispensary, it was closed at the time for renovations.  (*See* Fanta Dep. 98; Ownbey Dep. 27, ECF No. 69-2.)

[9] Additional excerpts of this deposition are available at ECF No. 80-8.

5 Guys decided to invest $1.5 million for a 22.5% stake in GLHM.  (*See* Fanta Texts 2, ECF No. 69-12, PageID.712; Fanta Dep. 76.)  On July 1, 2022, Fanta sent 5 Guys a Private Placement Memorandum (PPM) that spelled out the terms of the agreement.  (PPM, ECF No. 1-1; Fanta Texts 3, ECF No. 103-62, PageID.4541.)  Leonowicz wrote the PPM, and Fanta testified that he did not read it before forwarding it to 5 Guys.  (Fanta Dep. 79.)  The PPM contained an offering of stock by GLHM.  (PPM 3.)  5 Guys' claims are based on three alleged misrepresentations in the PPM:

- "Once a subscription is accepted by the Company, the funds will be immediately available to the Company."  (*Id.* at 5.)

- "[T]he Company faces all the risks inherent in any *new business*."  (*Id.* at 8 (emphasis added).)

- "The Company is seeking total commitments of up to $1,500,000 to subscribe for 220,000 total Class B Stocks."  (*Id.* at 10.)  In a subsequent email, Leonowicz specified that "[f]or purposes of distributions, Class A and Class B stock are identical," and distributions would "be paid out pro-rata."  (July 2022 Emails 1, ECF No. 80-1, PageID.923.)

On July 12, Pandya emailed Leonowicz and agreed to proceed with the investment.  (July 2022 Emails 2, ECF No. 80-2, PageID.930.)  Later that day, 5 Guys' attorney sent Leonowicz an email asking for instructions to wire the money.  (*Id.*)  The PPM specifically provided that wiring the investment was not permitted (PPM 18), but Leonowicz sent wiring instructions the following day without comment (July 2022 Emails 2, PageID.929).  The PPM also required the investors to complete a questionnaire and subscription agreement in order to buy stock (PPM 18), but the investors did not recall ever submitting those documents or even signing the PPM itself.  (Pandya Dep. 146; Mahmood Dep. 72–73; H. Patel Dep. 111; D. Patel Dep. 73–74.)  Instead, the investors

4

simply wired the $1.5 million to Redbud between July 15 and July 18, 2022.  (Account Activity, ECF No. 103-21, PageID.4288.)

5 Guys alleges that several of the representations in the PPM were fraudulent in light of how Defendants ultimately spent the $1.5 million investment.  According to Ownbey, no money from 5 Guys or Redbud ever went to the Muskegon dispensary—it was entirely funded by him and his company.  (Ownbey Aff. ¶ 28, ECF No. 69-20.)  In fact, Ownbey did not even know that 5 Guys had made an investment.  (*Id.* ¶¶ 27, 29.)  Defendants aver that "the funds provided by 5 Guys to Redbud Roots for the stock purchased was subsequently utilized by Redbud Roots, Inc. for ongoing operational expenses such as purchase of raw materials, payroll, and packaging."  (Interrogatory Responses 4, ECF No. 103-14.)   Sarah McGuire, Redbud's accounting expert, testified that the money was transferred to three Redbud accounts: Redbud Roots Lab II, Inc., Redbud Roots Lab IV, Inc., and FMFL Facilities, LLC.  (McGuire Dep. 25, ECF No. 103-7.)  Lab II operates Redbud's growing facilities; Lab IV operates Redbud's processing operations.  (*Id.*)  FMFL was used for Redbud's payroll, and paid salaries to Murray, Finley, Fanta, and Leonowicz of about $250,000 each.  (Murray Dep. 49, 76.)[10]

The PPM also represented that 5 Guys would receive stock in exchange for its investment.  On August 11, 2022, Leonowicz emailed 5 Guys to confirm that the stock had been issued, and that 5 Guys held 220,000 of the 1,000,000 outstanding shares.  (July 2022 Emails 2, PageID.926.)  Leonowicz added that "[t]he consent resolution memorializing this has been drafted but is still pending a signature from Jacob [Ownbey]."  (*Id.*, PageID.926.)  However, according to Ownbey,

---

[10] Defendants argue that some of the funds that went to FMFL may have gone to GLHM employees because at least one GLHM employee was on Redbud's payroll.  (*See* Leyba Dep. 38, ECF No. 87-1.)  But it appears that GLHM generally reimbursed FMFL for payroll expenses (*see id.*), so any money 5 Guys provided to FMFL would have been a net gain for Redbud rather than for GLHM.

GLHM never had "any Board discussion or authorization to market or sell any Class B shares of GLH-Muskegon at any time to 5 Guys or any other party." (Ownbey Aff. ¶ 30.)

Ultimately, the Muskegon dispensary was not financially successful. 5 Guys alleges that the venture failed because Fanta and Leonowicz took revenue from the dispensary that should have gone to its operations. Ownbey testified that he "believed there was at least a couple hundred thousand dollars that was taken out of [GLHM's] books incorrectly" by Leonowicz. (Ownbey Dep. 67, ECF No. 103-6.[11]) Redbud also collected 10% of GLHM's dispensary's revenues from Ownbey every month (*id.* at 43), though the exact purpose of this 10% cut is disputed. (*See* Fanta Dep. 25; Pl.'s Redbud Resp. Br. 33, ECF No. 99; Ownbey Dep. 43.) 5 Guys was unaware that Redbud was taking a cut of GLHM's revenues. (Pandya Dep. 119.) Ownbey testified that the 10% cut was prearranged, and that Redbud had required the same fee when he operated the Kalamazoo dispensary. (Ownbey Dep. 43–44.)

From July to December of 2022, 5 Guys received a total of $147,465.53 in dividends from the Muskegon dispensary. (Dividend Distributions, ECF No. 103-27, PageID.4324.) Murray testified that Redbud ultimately stopped paying dividends to 5 Guys because Ownbey was not regularly paying Redbud. (Murray Dep. 72.) On April 13, 2023, Redbud filed a lawsuit in state court against Ownbey, accusing him of embezzling money from its dispensaries. (State Complaint, ECF No. 87-7.) Around this time, 5 Guys became suspicious that Redbud was not being honest about GLHM and began to investigate. (*See* Lamis Dep. 10, 13, 15, ECF No. 103-13.)

On August 7, 2023, 5 Guys sent a letter to Defendants accusing them of fraud and notifying them of potential future litigation. (8/7/2023 Letter, ECF No. 103-52.) In June and July of 2024, Defendants paid 5 Guys a total of $250,000, though the parties disagree on the nature of these

---

[11] Additional excerpts of this deposition are available at ECF Nos. 69-2 and 84-5.

payments.  Defendants characterize the payments as 5 Guys' share of the sale of GLHM in July of 2024 for about $1 million.  (Redbud Mot. 28, ECF No. 84.)  But there is no evidence that 5 Guys was aware such a sale had occurred when it received the payments.  Rather, when they made the payments, Defendants characterized them as the first installments of a settlement agreement that was still in the negotiation process.  (*See* 6/13/2024 Tompkins Email 2, ECF No. 103-57; 7/25/2024 Gates Email, ECF No. 103-61, PageID.4533.)  The settlement agreement was never finalized.[12]

## II. LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is material if it "might affect the outcome of the suit."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A material fact is genuinely disputed when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Id.* at 249 (citing *First Nat'l Bank of Ariz. v. City Serv. Co.*, 391 U.S. 253, 288–89 (1961)).  Summary judgment is not an opportunity for the Court to resolve factual disputes.  *Id.*  The Court "must shy away from weighing the evidence and instead view all the facts in the light most favorable to the nonmoving party and draw all justifiable inferences in their favor."  *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 410 (6th Cir. 2021).

"[T]he standard that a movant must meet to obtain summary judgment depends on who will bear the burden of proof at trial."  *Trs. of Iron Workers Defined Contribution Pension Fund*

---

[12] Defendants argue that the details of these settlement negotiations are inadmissible under Rule 408 of the Federal Rules of Evidence, which prohibits the introduction of settlement-related statements "to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction."  Fed. R. Evid. 408(a).  Rule 408 clarifies that "[t]he court may admit this evidence for another purpose."  *Id.* 408(b).  The Court includes details about the settlement negotiations not to suggest that Defendants admitted guilt, but rather to clarify the parties' differing understanding of the purpose of these payments.

*v. Next Century Rebar, LLC*, 115 F.4th 480, 488 (6th Cir. 2024) (alteration in original) (quoting *Pineda v. Hamilton County*, 977 F.3d 483, 491 (6th Cir. 2020)).  "[W]hen the moving party bears the burden of proof [at trial], their initial summary judgment burden is higher in that [they] must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it." *Id.* (cleaned up).  When the moving party does not bear the burden of proof at trial, they may meet their initial burden at summary judgment by "submitting affirmative evidence that negates an essential element of the nonmoving party's claim," *Kava v. Peters*, 450 F. App'x 470, 473 (6th Cir. 2011) (cleaned up), or by "pointing out the lack of evidence to support an essential element" of that claim, *Rockwood Auto Parts, Inc. v. Monroe County*, 155 F.4th 557, 566 (6th Cir. 2025) (cleaned up).  The nonmovant must then present "sufficient evidence from which a jury could reasonably find in [their] favor." *Davis v. Sig Sauer, Inc.*, 126 F.4th 1213, 1230 (6th Cir. 2025) (cleaned up).

### III. ANALYSIS

The Court's analysis proceeds in three parts.  First, it considers whether the contractual-illegality doctrine bars 5 Guys from obtaining relief, and concludes that some of 5 Guys' claims may proceed.  Second, it examines the merits of 5 Guys' claims, and finds that Defendants are entitled to summary judgment on some but not all counts.  Finally, it discusses the possibility of piercing the corporate veil, and holds that such a remedy is unavailable here.

### A. Illegality

Although the possession and distribution of marijuana is legal in some circumstances under Michigan law, it remains federally illegal.  *See* Controlled Substances Act ("CSA"), 21 U.S.C. §§ 801–904.[13]  "Not only does the CSA make it unlawful to grow, possess, dispense, and distribute

---

[13] The Department of Justice recently reclassified FDA-approved drug products containing marijuana from a Schedule I controlled substance to a Schedule III controlled substance.  Schedules of Controlled Substances, 91 Fed. Reg. 22714

marijuana, but it creates a comprehensive scheme that criminalizes the full range of marijuana-related activities, including providing operational space for such activities." *Sensoria, LLC v. Kaweske*, 581 F. Supp. 3d 1243, 1257 (D. Colo. 2022). "Moreover, the CSA continues to apply in full force even in states that have de-criminalized marijuana." *Id.* at 1257–58. Thus, the parties' agreement to operate a marijuana dispensary was contrary to federal law.

Generally, "federal courts may not assist 'in any way towards carrying out the terms of an illegal contract.'" *CCH Acquisitions, LLC v. J&J&D Holdings, LLC*, No. 2:23-cv-2983, 2025 WL 601249, at *3 (S.D. Ohio Feb. 25, 2025) (internal quotation marks omitted) (quoting *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 77 (1982)). Defendants argue that the illegality doctrine precludes 5 Guys from recovering on any claim, while 5 Guys contends that the Court may grant certain forms of relief without endorsing illegal conduct. As explained below, the Court agrees with 5 Guys that some of its requested relief would not run afoul of the illegality doctrine.

Because the business arrangement here violated a federal statute, the Court looks to federal law to determine the scope of the illegality doctrine, even though some of 5 Guys' claims arise under state law. *Kelly v. Kosuga*, 358 U.S. 516, 519 (1959) ("[T]he effect of illegality under a federal statute is a matter of federal law, even in diversity actions in the federal courts after *Erie*." (citation omitted)); *see also Sola Elec. Co. v. Jefferson Elec. Co.*, 317 U.S. 173, 176 (1942); *N. Ind. Pub. Serv. Co. v. Carbon Cnty. Coal Co.*, 799 F.2d 265, 273 (7th Cir. 1986). *But see Bassidji v. Goe*, 413 F.3d 928, 936 (9th Cir. 2005) (recognizing that lower courts have been inconsistent

---

(Apr. 28, 2026). President Trump has also directed the Attorney General to reclassify marijuana as a Schedule III controlled substance, *see* Exec. Order No. 14370, 90 Fed. Reg. 60841 (Dec. 18, 2025), a process that is ongoing, *see* 4/23/2026 Press Release, Department of Justice, https://www.justice.gov/opa/pr/justice-department-places-fda-approved-marijuana-products-and-products-containing-marijuana (accessed June 8, 2026). Putting aside the question of whether a subsequent change in law can render a previously illegal contract enforceable, the parties do not contend that the Muskegon dispensary was distributing only FDA-approved products. And even if all marijuana products are reclassified as Schedule III controlled substances, the contract at issue here would still be illegal because the unauthorized distribution of these products would remain a crime—just a less serious one. *See* 21 U.S.C. §§ 841(a)(1), 802(6) (defining "controlled substance" to include Schedule III substances).

on this issue).  The Supreme Court's precedents "leave no doubt that illegal promises will not be enforced" by federal courts.  *Kaiser*, 455 U.S. at 77.  But the illegality doctrine's precise contours remain unsettled.  As one court observed, "when we ask what is the federal rule on illegality as a contract defense, we find, alas, that the course of decision has not run completely true."  *N. Ind. Pub. Serv. Co.*, 799 F.2d at 273.

The Supreme Court has tended to treat the contractual-illegality doctrine as a categorical bar to relief.  Indeed, the Court has declared that "[t]he authorities from the earliest time to the present unanimously hold that no court will lend its assistance in any way towards carrying out the terms of an illegal contract."  *Kaiser*, 455 U.S. at 77 (quoting *McMullen v. Hoffman*, 174 U.S. 639, 654 (1899)).  This is because a court may not be "a party to the carrying out of" an illegal promise.  *Id.* at 80 (quoting *Kelly*, 358 U.S. at 520).  Thus,

> a court will not lend its aid, in any way, to a party seeking to realize the fruits of an agreement that appears to be tainted with illegality, although the result of applying that rule may sometimes be to shield one who has got something for which . . . he ought, perhaps, to pay . . . .

*Cont'l Wall Paper Co. v. Louis Voight & Sons Co.*, 212 U.S. 227, 262 (1909); *see also E. Bement & Sons v. Nat'l Harrow Co.*, 186 U.S. 70, 88 (1902) ("As the statute makes the contract in itself illegal, no recovery can be had upon it when the defense of illegality is shown to the court."); *Connolly v. Union Sewer Pipe Co.*, 184 U.S. 540, 548 (1902) ("It is undoubtedly the general rule that a contract made in violation of a statute is void, and no recovery can be had upon it . . . ."), *overruled in part on other grounds by Tigner v. Texas*, 310 U.S. 141 (1940).

Some courts have framed the illegality doctrine in the categorical manner suggested by the Supreme Court.  *See, e.g.*, *Apical Biotek, LLC v. Maitri Holdings, LLC*, No. 25-1396, 2026 WL 177927, at *2 (3d Cir. Jan. 22, 2026) ("If that business [violates federal law], then claims based on a contract to provide such a business services should be dismissed . . . ."); *CCH Acquisitions,*

2025 WL 601249, at *5.  But others have adopted a more flexible approach.  According to the Ninth Circuit, "[n]uanced approaches to the illegal contract defense, taking into account such considerations as the avoidance of windfalls . . . remain viable in federal court and represent no departure from *Kaiser Steel*, but only as long as the relief ordered does not mandate illegal conduct."  *Bassidji*, 413 F.3d at 937–38; *see also KUSH, Inc. v. Van Vranken*, No. 220CV649, 2020 WL 8371452, at *5 (D. Nev. June 19, 2020) ("[C]ourts have recognized the need to enforce 'illegal' contracts in order to avoid unjustly enriching a defendant or disproportionately penalizing a plaintiff.").  Similarly, the Seventh Circuit has stated that

> [i]t is not yet the law that if a contractual provision is illegal . . . the contract cannot be enforced, regardless of the nature and consequences of the illegality. . . . [T]he contract defense of illegality is flexible rather than rigid, and will not be applied where it would produce a sanction disproportionate to the wrong, as it might well do here.

*Olson v. Paine, Webber, Jackson & Curtis, Inc.*, 806 F.2d 731, 743 (7th Cir. 1986); *see also Bartch v. Barch*, 111 F.4th 1043, 1055 (10th Cir. 2024) ("General compensatory damages may remedy a breach of [an illegal] contract provided the damages award does not require a losing party to violate federal law.").

The Sixth Circuit, for its part, has not adopted a consistent position on the issue.  *Compare, e.g.*, *Associated Press v. Taft-Ingalls Corp.*, 340 F.2d 753, 759 (6th Cir. 1965) ("A party to an illegal bargain cannot 'recover damages for breach thereof.'" (quoting Restatement (First) of Contracts § 598 (A.L.I. 1932)), *and Nat'l Transformer Corp. v. France Mfg. Co.*, 215 F.2d 343, 361 (6th Cir. 1954) ("[A] contract which cannot be performed without violation of a statute is illegal and void."), *with United States v. Luxury Blankets, Inc.*, No. 84-3519, 1985 WL 13194, at *3 (6th Cir. Apr. 23, 1985) ("[T]he illegality of a contract does not automatically render it[] unenforceable."), *and Jackson Purchase Rural Elec. Co-op. Ass'n v. Loc. Union 816, IBEW*, 646

F.2d 264, 267 (6th Cir. 1981) ("[I]t is not the case that all unlawful agreements are ipso facto void. If the denial of relief is disproportionately inequitable the right to recover will not be denied.").

In this Court's view, *Kaiser* and its predecessors validate some, but not all, of the principles adopted by subsequent courts. *Kaiser* dictates that in a narrow set of cases—where a judgment "would itself be enforcing the precise conduct made unlawful by" Congress, 455 U.S. at 80—the illegality doctrine imposes a categorical bar to relief. Beyond that set of cases—i.e., "past the point where the judgment of the Court would itself be enforcing the precise conduct made unlawful by" a federal statute—the rule becomes more flexible, and "courts are to be guided by the overriding general policy of preventing people from getting other people's property for nothing when they purport to be buying it." *Id.* (cleaned up). The key question is where to draw the line between cases covered by the categorical bar and cases that warrant a more flexible approach. Some Courts of Appeals draw the line at the point where "the relief ordered" actually "mandate[s] illegal conduct." *Bassidji*, 413 F.3d at 938; *see Bartch*, 111 F.4th at 1055. This view would bar a court from ordering specific performance where that performance constitutes a crime, but it would not appear to bar any damages remedy. *See Bartch*, 111 F.4th at 1055.

In the Court's opinion, that view unjustifiably circumscribes the scope of *Kaiser*. The better reading of Supreme Court precedent is that *Kaiser*'s categorical bar applies to any attempt to enforce the contract—whether or not that enforcement involves literally ordering a party to commit a crime. The language of *Kaiser* supports this broader view: *Kaiser* prohibits a court from "enforcing the precise conduct made unlawful by" Congress, 455 U.S. at 80, or from "lend[ing] its assistance in any way towards carrying out the terms of an illegal contract," *id.* at 77, or becoming "a party to the carrying out of" an illegal promise, *id.* at 80. Earlier cases similarly bar a court from "lend[ing] its aid, in any way, to a party seeking to realize the fruits of an agreement

12

that appears to be tainted with illegality," *Cont'l Wall Paper Co.*, 212 U.S. at 262, and explicitly rule out the possibility of "recovery" on an illegal contract. *E. Bement & Sons*, 186 U.S. at 88; *Connolly*, 184 U.S. at 548. These cases support the view that a party who seeks to recover expectation damages based on the anticipated result of an illegal contract is asking the Court to enforce that contract, which it cannot do.

However, any attempt to apply the illegality doctrine to this case runs into a complication: None of 5 Guys' claims are straightforwardly contractual claims. Counts I to V are fraud claims, Counts VIII and IX are corporate law claims, and Counts X and XI are conversion claims. None of these claims are efforts to hold Defendants to the terms of a contract. Rather, 5 Guys seeks to rescind the contract and to obtain damages for Defendants' alleged torts and violations of fiduciary duty. The Court must therefore determine whether each claim is sufficiently analogous to contract enforcement to trigger *Kaiser*'s categorical bar.

Beginning with the corporate law claims, the Court finds that it cannot grant damages based on violations of Defendants' duties as shareholders and board members of GLHM. In the same way that awarding damages for breach of an illegal contract serves to validate the contract by implying that the defendant should have complied with its terms, awarding damages for Defendants' failure to accord 5 Guys its rights as shareholder would validate the illegal enterprise by implying that Defendants should have fulfilled their corporate duties. Although these corporate law claims are not, strictly speaking, attempts to enforce a contract, they implicate the same concern identified by *Kaiser* and are thus subject to the categorical bar.

On the other hand, 5 Guys' conversion claims do not trigger *Kaiser* because they are not analogous to contractual claims. The claim that Defendants stole 5 Guys' investment does not rest on the validity of an underlying contract, and finding that conversion took place would in no way

13

imply that Defendants should have adhered to the illegal agreement.  Thus, granting relief on these claims does not implicate the illegality doctrine.

Finally, the fraud claims warrant a more detailed analysis.  These claims—brought under the Exchange Act, the MUSA, and Michigan common law—appear contractual insofar as they are based on the allegation that Defendants fraudulently induced 5 Guys to enter an investment agreement.  But these claims technically sound in tort or unjust enrichment, and are thus not squarely implicated by the illegality doctrine.  The parties suggest that 5 Guys is requesting rescission of the investment contract, a remedy that plainly implicates contract law.  But because rescission involves undoing rather than validating a contract, it is not clear that such relief is barred by the illegality doctrine's prohibition on enforcement.  *See Sensoria*, 581 F. Supp. 3d at 1261–62.

In this context, it is more accurate to characterize 5 Guys' requested remedy as restitutionary rather than contractual because 5 Guys seeks this remedy from people and entities who were not parties to the investment contract.  *See* Restatement (Third) of Restitution and Unjust Enrichment § 54 (A.L.I. 2011) (discussing rescission and restitution).  The PPM offered a contract between 5 Guys and GLHM—not Redbud, Lab VII, Leonowicz, or Fanta.[14]  It is true that the PPM was never formally executed, and 5 Guys did not accept the PPM in the manner it specified—for one thing, the PPM stated that 5 Guys could not invest via wire transfer, which it did.  *See* Restatement (Second) of Contracts § 58 (A.L.I. 1981) ("An acceptance must comply with the requirements of the offer as to the promise to be made or the performance to be rendered.").  But 5 Guys' request to Leonowicz for wiring instructions served as an implicit counteroffer, modifying

---

[14] Even if (as the Court suggests below) Leonowicz and Fanta lacked actual authority to solicit investments on behalf of GLHM, "the fact that an agent acted without power to subject the principal to liability does not make the agent a party to the contract."  Restatement (Third) Of Agency § 6.01 (A.L.I. 2006).

14

the terms to allow acceptance via wire transfer.  When Leonowicz provided those instructions and 5 Guys wired the money, a contract was formed via performance.  *See id.* § 50; *DaimlerChrysler Corp. v. Wesco Distribution, Inc.*, 760 N.W.2d 828, 832 (Mich. Ct. App. 2008) ("A meeting of the minds can be found from performance and acquiescence in that performance.").  As the parties did not otherwise manifest an intent to modify the terms of the PPM, the contract created by the parties' conduct contained the same terms as the PPM.

Because 5 Guys alleges that Defendants fraudulently induced it to execute a contract with a third party, ordering Defendants to return 5 Guys' investment would not constitute enforcement of that contract.  Moreover, unlike a contractual damages remedy, a restitutionary remedy would not provide 5 Guys the benefit of its contractual bargain or imply that Defendants acted wrongfully by failing to comply with an illegal contract.  Rather, by granting such a remedy, the Court would merely imply that Defendants should not have falsely promised to break the law, which is a perfectly benign pronouncement.  Thus, for the foregoing reasons, restitution is not barred by *Kaiser*.

This conclusion aligns with numerous district court cases regarding marijuana-related business deals.  For instance, the *Sensoria* court was careful to distinguish between relief that directly enforces an illegal contract (which is prohibited) and relief that indirectly implicates an illegal contract (which may not be).  *See* 581 F. Supp. 3d at 1261–62.  Thus, the court held that it could in principle grant rescission of an illegal contract based on fraud.  *Id.* at 1265.  Similarly, in *Erickson v. Pfiester*, a court held that the illegality doctrine did not bar the plaintiffs from recovering their investment in a marijuana company because "returning Plaintiffs' investment does not cause either party to violate the CSA."  No. 1:21-cv-9, 2023 WL 6297343, at *2 (D. Alaska Sept. 27, 2023).  More generally, the case law does not support the view that the Court is unable

to grant any relief tangentially connected to a marijuana-related business deal. *See, e.g.*, *Indian Hills Holdings, LLC v. Frye*, No. 320CV00461, 2021 WL 5994036, at *10 (S.D. Cal. Dec. 17, 2021); *Mann v. Gullickson*, No. 15-cv-03630, 2016 WL 6473215, at *7 (N.D. Cal. Nov. 2, 2016); *Ginsburg v. ICC Holdings, LLC*, No. 3:16-cv-2311-D, 2017 WL 5467688, at *8 (N.D. Tex. Nov. 13, 2017); *cf. D.R. Wilder Mfg. Co. v. Corn Prods. Ref. Co.*, 236 U.S. 165, 172 (1915) ("[C]ourts may not refuse to enforce an otherwise legal contract because of some indirect benefit to a wrongdoer which would be afforded from doing so, or some remote aid to the accomplishment of a wrong which might possibly result.").

The cases that have resulted in a contrary holding are inapposite or unpersuasive. Some courts have refused to allow a breach of contract claim seeking damages, *see, e.g.*, *J. Lilly, LLC v. Clearspan Fabric Structures Int'l, Inc.*, No. 18-cv-01104, 2020 WL 1855190, at *11 (D. Or. Apr. 13, 2020), but that holding follows from *Kaiser*'s prohibition on contractual enforcement and does not carry over to the claims asserted here. Other courts have refused to award a plaintiff profits from an illegal company, *see, e.g.*, *Polk v. Gontmakher*, No. 18-cv-01434, 2020 WL 2572536, at *2 (W.D. Wash. May 21, 2020), but that holding is similarly justified by *Kaiser* because awarding profits would require the Court to vindicate the plaintiff's expectation interest in an illegal business.

Defendants point to *1240 South Bannock, LLC v. Siem*, where the court held that it could not "disentangle the claims of fraud from the alleged breach of contract because they essentially rely upon the same conduct." No. 2:21-cv-183, 2022 WL 2161386, at *6 (W.D. Mich. May 27, 2022), *R&R adopted*, 2022 WL 2158384 (W.D. Mich. June 15, 2022). But that holding relied on a rule of Michigan law that prevents parties from bringing fraud claims based on false contractual promises. *See id.* at *2 ("The appropriate cause of action based upon a promise to do a future act

16

is based in contract and not in fraud."); *see also CCH*, 2025 WL 601249, at *7 ("Plaintiffs' misrepresentation and silent fraud claims are fatally intertwined with the breach of contract claim."). As the Court will explain when it analyzes the merits of 5 Guys' claims (*see infra* Section III.B.4(a)), that rule (and therefore *1240 South Bannock*) is inapplicable here because 5 Guys has no available contractual remedies against these Defendants.

In cases more analogous to the instant one, some courts have refused to grant restitutionary remedies for unjust enrichment when the underlying transaction was related to marijuana. *See, e.g.*, *AgriAuto Genetics, LLC v. Harris*, No. 22-cv-273, 2023 WL 8371940, at *2–3 (E.D. Okla. Dec. 4, 2023); *Bart St. III v. ACC Enters., LLC*, No. 217CV00083, 2020 WL 1638329, at *9 (D. Nev. Apr. 1, 2020). The Supreme Court's precedents do not squarely address the issue of whether a plaintiff who is unable to seek damages for breach of an illegal contract may nevertheless seek restitution for unjust enrichment. The availability of an unjust enrichment claim might seem too neat of a loophole, allowing plaintiffs to enforce the contract in all but name and recover (for example) any profits from the illegal contract that accrued to the defendant.[15]  However, this concern is not implicated here, where a restitutionary remedy would merely entail a return of 5 Guys' investment, not a validation of their contractual expectations or an accounting of any illegal profits.

Of course, even if *Kaiser*'s categorical bar does not prohibit relief, the illegality doctrine is not entirely without force. Instead, the court must engage in a flexible inquiry, weighing the more diffuse interest in avoiding the implicit condoning of illegal acts against inequities that result

---

[15] The Restatement's view is that a person unjustly enriched by an illegal contract might be liable in restitution to the other contracting party, depending on whether granting restitution would align with "the policy of the underlying prohibition" of which the contract ran afoul.  Restatement (Third) of Restitution and Unjust Enrichment § 32 (A.L.I. 2011).

from a failure to grant relief.  *See Jackson Purchase*, 646 F.2d at 267 (illegality doctrine allows relief when "the denial of relief is disproportionately inequitable"); *Bassidji*, 413 F.3d at 937–38; Restatement (Third) of Restitution and Unjust Enrichment § 32 cmt. a.  And if the plaintiff was party to an illegal agreement, the equitable doctrine of unclean hands may prohibit relief regardless of whether the *Kaiser* bar strictly applies.  *See* Restatement (Third) of Restitution and Unjust Enrichment § 63.  To determine whether denying relief would be inequitable, the Court should "tak[e] into account such considerations as the avoidance of windfalls or forfeitures, deterrence of illegal conduct, and relative moral culpability." *Bassidji*, 413 F.3d at 937–38.

The balance of equities supports allowing 5 Guys to recover on their fraud claims.  If Defendants fraudulently induced 5 Guys to invest, "it would be patently unfair for Defendants to retain what amounts to an unjust windfall." *Erickson*, 2023 WL 6297343, at *4.  And Defendants would plainly be more morally culpable, given that all parties engaged in a federally illegal business but only Defendants committed fraud.  *Id.*   Moreover, if the Court denied relief on the basis of illegality, "Defendants would be incentivized to start more illegitimate business, seek investment, and use the illegality defense to avoid any obligations related thereto." *Id.*

Furthermore, the countervailing public policy interest in avoiding the validation of illegal contracts is relatively weak here.  "Although cannabis remains illegal under federal law, the federal government generally does not prosecute the sale of cannabis that complies with state law." *Peridot Tree WA Inc. v. Wash. State Liquor & Cannabis Control Bd.*, No. 3:23-CV-06111 2024 WL 69733, at *1 (W.D. Wash. Jan. 5, 2024).  At this point, forty states and the District of Columbia have at least partially legalized marijuana.  *United States v. Hemani*, No. 24-1234, 2026 WL 1751710, at *11 (U.S. June 18, 2026).  As the Supreme Court recently observed, "[w]hatever one thinks of these developments, the federal government has not just tolerated them; it helped fuel

them." *Id.* Under these circumstances, the Court finds that equitable considerations support allowing 5 Guys' fraud claims to proceed.

Defendants raise two additional arguments in opposition to the availability of relief, but neither is availing. First, Defendants contend that if the Court allows 5 Guys to recover its investment, Defendants should be able to recover the property that they transferred to 5 Guys in exchange for that investment, namely stock dividends and the stock itself. And Defendants argue that it would violate the illegality doctrine for the Court to order 5 Guys to transfer stock dividends from, or an equity interest in, an illegal enterprise. Even assuming this is true, there is no need for 5 Guys to transfer back the dividends they received; those dividends can simply be subtracted from whatever recovery 5 Guys obtains. Moreover, it is not clear that 5 Guys ever actually received any stock in GLHM. Ownbey testified that GLHM never authorized any stock issuance and that he never knew about 5 Guys' investment. If 5 Guys never possessed any stock, they obviously do not need to return it.

Second, Defendants contend that the Court cannot authorize 5 Guys to recover any money from Redbud because federal courts cannot grant recovery from illegal assets, and Redbud—as a marijuana company—possesses only illegal assets. Other courts have held that they are unable to "award monetary damages paid from a marijuana asset or income stream." *Sensoria*, 581 F. Supp. 3d at 1260. But the question of whether Redbud possesses any assets that can be meaningfully separated from its marijuana business is premature at this stage. And the Court rejects Redbud's contention that any assets owned by a company whose purpose is to sell marijuana are inaccessible to a federal court. If that were the case, every marijuana company would be immune from liability in federal court on any claim, even those unrelated to an illegal contract. The Court declines to endorse a doctrine that would bar a money judgment against any company that engages in a

19

federally illegal business.  *Cf. Kenney v. Helix TCS, Inc.*, 939 F.3d 1106 (10th Cir. 2019) (marijuana companies are not categorically immune from liability under the Fair Labor Standards Act).  Any more specific complications related to the particular assets at issue can be addressed at a later stage.

*   *   *

In sum, the illegality doctrine bars only those claims for breach of fiduciary duty (Count VIII) and minority shareholder oppression (Count IX).  The Court will thus grant summary judgment to Defendants on those claims.

### B. Merits

With the illegality issue out of the way, the surviving claims are those for securities fraud under federal and state law, common law fraud (fraudulent misrepresentation, silent fraud, and innocent misrepresentation), and conversion.  Before addressing these specific claims, the Court will discuss two preliminary issues.

#### 1. Shareholder Standing

Defendants argue that 5 Guys cannot bring any fraud claims based on the contention that its investment should have gone to GLHM because such claims must be brought in a shareholder derivative suit on behalf of GLHM, the injured party.  Defendants are correct that "[i]f a claim is derivative, a shareholder has no standing to sue except on behalf of the corporation."  *Murphy v. Inman*, 983 N.W.2d 354, 369 (Mich. 2022).  But it is not clear that 5 Guys could bring a derivative suit, as there is a genuine dispute as to whether 5 Guys was ever a shareholder of GLHM, as Ownbey testified that GLHM never authorized a stock issuance.  Moreover, the wrong alleged by 5 Guys is not Defendants' failure to provide its investment funds to GLHM, but rather Defendants' false promise that they *would* provide the funds to GLHM.  While the failure to provide the funds might be an injury to GLHM, the false promise is a direct injury to 5 Guys, and thus is properly

redressed via a direct (not derivative) suit. *See, e.g., Poptech, LP v. Stewardship Inv. Advisors, LLC*, 849 F. Supp. 2d 249, 263 (D. Conn. 2012) ("Fraudulent inducement claims are direct because they allege a harm suffered by plaintiff independent of the [corporation] and a duty to plaintiff that is not merely derivative of the defendant's fiduciary duties to the [corporation]." (cleaned up)).

### 2. Attribution

Defendants also contend that the statements in the PPM, which form the basis of 5 Guys' fraud claims, are not attributable to them. Defendants point out that liability under Rule 10b-5 attaches only to one who "makes" a statement, not one who merely prepares it. *Janus Cap. Grp. v. First Derivative Traders*, 564 U.S. 135, 148 (2011). Thus, the proper defendant under Rule 10b-5 is "the person or entity with ultimate authority over the statement." *Id.* at 142. Defendants argue that they did not have ultimate authority over the PPM because the PPM purports to be a communication from GLHM to prospective investors. Fanta sent the PPM to 5 Guys, but claims that he did not read it; Leonowicz wrote the PPM, but claims that he did so only as GLHM's attorney. And though Defendants focus on the 10b-5 standard established by *Janus*, the same concern about responsibility for the statements arises for 5 Guys' state law claims.

The Court agrees that there is no evidence Fanta was directly involved in writing the PPM or that any of its contents should be attributed to him. But this does not completely eliminate Fanta's liability, because Fanta is responsible for his own representations to 5 Guys—for example, his statement that 5 Guys' investment would go towards the Muskegon dispensary. (*See* Mahmood Dep. 32; D. Patel Dep. 36–37; Pandya Dep. 273; Fanta Dep. 73.) The specific representations for which Fanta may be held liable will be addressed below (*see infra* Section III.B.3(a)). As to Leonowicz, there is sufficient evidence to hold him responsible for the statements in the PPM. Although Leonowicz claims to have been acting on behalf of GLHM, it does not appear he had authority to solicit investments; as noted above, there is a dispute as to whether GLHM ever

21

authorized a stock issuance. If Leonowicz was not acting on GLHM's behalf, then as a practical matter he had ultimate authority over the statements in the PPM and the *Janus* test is satisfied.[16]

Given that Redbud ultimately benefitted from the alleged fraud by receiving much of the $1.5 million, it is also reasonable to infer that Leonowicz was acting as an agent of Redbud when he crafted the PPM. *See In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 476 (9th Cir. 2015) ("[A] corporation is responsible for a corporate officer's fraud committed within the scope of his employment or for a misleading statement made by an employee or other agent who has actual or apparent authority."). Thus, Redbud may also be viewed as a maker of the fraudulent statements. However, there is no evidence that Lab VIII had any involvement in the alleged fraud. None of the statements in the PPM can be reasonably attributed to Lab VIII, and there is no evidence that it received any of the investment money. The Court will therefore grant summary judgment to Lab VIII on the fraud claims.

\* \* \*

Having addressed these preliminary matters, the Court will now analyze the merits of the specific claims brought by 5 Guys.

### 3. Securities Fraud

First, 5 Guys brings claims for securities fraud under both Rule 10b-5 and Michigan's state-law equivalent, the MUSA. Rule 10b-5 makes it unlawful to, "in connection with the purchase or sale of any security," make an "untrue statement of a material fact or to omit to state a material

---

[16] If Leonowicz had apparent (but not actual) authority to speak on behalf of GLHM, then GLHM may also be liable under Rule 10b-5 because "[n]othing in *Janus* undid the long-standing rule that a corporation is liable for statements by employees who have apparent authority to make them." *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 426 (7th Cir. 2015) (cleaned up). But this fact would not prevent Leonowicz from also being liable, as "[n]othing in *Janus* precludes a single statement from having multiple makers." *Id.* at 427. Nor would Leonowicz possessing apparent authority preclude a state law fraud claim. *See Magley v. M & W Inc.*, 926 N.W.2d 1, 5 (Mich. Ct. App. 2018) ("[A]n actor remains subject to liability although the actor acts as an agent or an employee, with actual or apparent authority, or within the scope of employment." (quoting *Dep't of Agriculture v. Appletree Mktg., LLC*, 779 N.W.2d 237, 246 n.39 (Mich. 2010))).

fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b-5.  Thus, a plaintiff must establish, "(1) in connection with the purchase or sale of securities, (2) the misstatement or omission of a material fact, (3) made with scienter, (4) upon which the plaintiff justifiably relied and (5) which proximately caused the plaintiff's injury." *Newtyn Partners, LP v. All. Data Sys. Corp.*, 165 F.4th 947, 959 (6th Cir. 2026).  The MUSA contains essentially the same language as Rule 10b-5, *see* Mich. Comp. Laws § 451.2501(b), and "a securities claim under the MUSA is nearly identical to the corresponding federal securities fraud claim."  *USM Holdings, Inc. v. Simon*, No. 15-14251, 2017 WL 4005939, at \*10 (E.D. Mich. Sept. 12, 2017) (cleaned up).  The Court will therefore address the federal and state law securities fraud claims together.

### (a) Falsity and Scienter

5 Guys points to three primary misrepresentations by Defendants.  The Court will consider each in turn.

*Use of Investment.* First, 5 Guys contends that Defendants promised that 5 Guys' investment would be used for GLHM, but Leonowicz and Fanta took the money for themselves. 5 Guys points to the representation in the PPM that "[o]nce a subscription is accepted by the Company"—i.e., GLHM—"the funds will be immediately available to the Company."  (PPM 5.) Defendants argue that other portions of the PPM suggest that the investment would not go to GLHM.  For instance, the PPM provided that "[t]he net proceeds of this Offering will primarily be used for operating expenses, ongoing business expenses, general working capital, payroll and benefit expenses, taxes, security expenses and other expenses to build, grow and develop each of the grow, processing and retail facilities."  (PPM 8.)  Because GLHM did not have "grow" or "processing" facilities, Defendants contend, the PPM contemplated the possibility that the money would go to Redbud instead of GLHM.

23

But the Court finds 5 Guys' reading of the PPM more persuasive.  The reference to growing and processing facilities reads more as a boilerplate list of all the possible facilities such an investment contract could involve, or that GLHM could later acquire, rather than an acknowledgement that the money could go to Redbud instead of GLHM.  And it would make little sense for 5 Guys to intend for its investment to go to Redbud, given that 5 Guys did not invest in Redbud and thus would not receive the fruits of such an investment.[17]  Moreover, all of the investors' prior interactions with Leonowicz and Fanta suggested that 5 Guys would be investing in GLHM so that it could operate or expand its business; Fanta directly told the investors that GLHM would use their investment to purchase inventory and potentially additional operating space.  Finally, the expectation that 5 Guys' investment would go to GLHM accords with industry practice: When an investor buys stock directly from a company (rather than a third party), they usually understand that they are investing in that company.  Because 5 Guys' investment did not go to GLHM, 5 Guys ended up with stock in a company that was worth $1.5 million less than they had expected.

Defendants next argue that 5 Guys cannot establish Leonowicz or Fanta personally took 5 Guys' investment.  This much is true, as the evidence merely indicates that the investment was transferred to other Redbud accounts.  Leonowicz and Fanta may have benefitted from those transfers, but there is no indication the money went directly to them.  However, that fact does not foreclose 5 Guys' claims, because as long as the money did not go to GLHM, the promise that it *would* go there was false.

Leonowicz and Fanta also object that they did not know how the investment would be used by Redbud, and did not control what the company did with the money.  Even assuming these

---

[17] Pandya had individually invested in Redbud's parent company.  (Pandya Dep. 38.)

24

objections are true, they are irrelevant.  As long as Leonowicz and Fanta knew that the money would go to Redbud instead of GLHM, they knew that their representations to the contrary were false.  Leonowicz presumably knew the money would go to Redbud because he sent the wiring instructions to 5 Guys, and Fanta was sufficiently involved in the transaction (and in Redbud generally) that it is reasonable to infer he also knew where the money was going.  Although theoretically they could have thought Redbud would in turn use the money to support GLHM, they had reason to believe that was not the case, as they knew that Ownbey had agreed to pay for all of GLHM's operating expenses.  (*See* 5/23/22 Leonowicz Email, ECF No. 103-31, PageID.4357.)

Finally, Defendants argue that the investors should have understood—or perhaps did understand—that their money was going to Redbud rather than GLHM because the account to which it wired the money had "Redbud" in its name.  (*See* Wiring Instructions, ECF No. 86-5, PageID.2446.)  But there was no reason for the investors to suspect that Leonowicz was providing them with the wrong account information.  Even if they noticed the name, they might have simply thought that GLHM's account was labeled as a Redbud account due to the relationship between the companies, or that the money would immediately be transferred from the Redbud account to GLHM's account.  It was only Leonowicz and Fanta, with their knowledge of Redbud's internal workings, that should have understood where the money was being transferred.

In short, 5 Guys has established a genuine dispute as to whether Defendants fraudulently misrepresented how its investment in GLHM would be used.

*Stock Dividends.*  Second, 5 Guys argues that although the PPM and Leonowicz's email represented that all shareholders would get dividends proportionate to the percentage of stock held,

Redbud in fact separately received monthly payments of 10% of GLHM's gross revenue.[18]  5 Guys characterizes the 10% cut as a backdoor mechanism for Redbud to receive dividends beyond its proportional share.  (Pl.'s Redbud Resp. Br. 30, ECF No. 99; *see* Redbud Financial Records, ECF No. 103-24.)  Redbud essentially agrees with 5 Guys that the 10% cut was an alternative means of collecting dividends, though it argues that taking the cut was not improper.  Redbud explains that "in late 2022" it became clear that Ownbey was not properly managing GLHM's finances and could not produce concrete sales or expense figures.  (Redbud Mot. 23.)  Because Defendants could not calculate GLHM's profits without such figures, they instead imposed a 10% flat fee "to take money from the known and undisputable amount—top line gross revenue."  (*Id.* at 24; *see also* Leonowicz Dep. 103, ECF No. 84-2.)  Redbud avers that it "always intended to provide 5 Guys with its proportionate share of the funds generated from the Muskegon Dispensary, regardless of how it was structured."  (Redbud Mot. 24.)

Accepting Defendants' explanation that the 10% fee was intended to be a substitute for dividends, it appears that 5 Guys was not provided its proper share of the 10% fee.  For example, in October 2022, Redbud received $100,693.33 from GLHM (*see* Redbud Financial Records, PageID.4301).  Given the amount of stock purportedly held by Redbud and 5 Guys—280,000 and 220,000 respectively (July 2022 Emails 2, PageID.926)—5 Guys should have received 44% of that distribution, or $44,305.06.  Instead, it received only $23,934.43. (Distribution Records, ECF No. 103-27, PageID.4324.)  And though the unequal distribution of dividends does not necessarily entail that Defendants lied when promising equal dividends, one can reasonably infer that

---

[18] There is no evidence that this representation was ever made by Fanta, so only Leonowicz and Redbud can be held liable for it.

Defendants collected the 10% cut with the intention of concealing the dividends they were receiving.

Moreover, Defendants' explanation of why they collected the 10% cut contradicts the record.  Though Defendants claim that they only implemented the 10% cut in late 2022 due to issues with Ownbey's recordkeeping practices, Ownbey testified that the 10% fee was implemented from the beginning of his arrangement with Redbud regarding GLHM—which began in early 2022—and was carried over from an agreement between Ownbey and Redbud regarding a prior dispensary.  (Ownbey Dep. 44.)  Moreover, Redbud's claim that it needed to use revenue for distributions because Ownbey did not record profits is undercut by the fact that Defendants regularly sent 5 Guys profit and loss statements purporting to show that the distributions from GHLM *were* calculated from GHLM's profits.  (*See* Ownbey Dep. 70; Fanta Dep. 29–30.)  Due to these holes in their explanation, Defendants have not met their burden to establish a lack of liability at summary judgment.

Defendants argue next that their failure to inform 5 Guys about the revenue cut was merely an omission rather than an affirmative misstatement.   It is true that "Rule 10b-5(b) does not proscribe pure omissions." *Macquarie Infrastructure Corp. v. Moab Partners, LP*, 601 U.S. 257, 264 (2024).  But Rule 10b-5 does prohibit omissions that "render any [other] 'statements made' misleading." *Id.* at 259 (quoting 17 C.F.R. § 240.10b–5(b)).  In other words, it "requires disclosure of information necessary to ensure that statements already made are clear and complete." *Id.* at 258.  Thus, an omission may be actionable under Rule 10b-5 if it occurred in connection with a half-truth—that is, a "representation[] that state[s] the truth only so far as it goes, while omitting critical qualifying information." *Id.*  Defendants' representations that dividends would be shared equally among stockholders are the kind of half-truths that needed further clarification.  Since

Defendants knew that they were deducting 10%, there is a genuine dispute as to whether they knowingly made fraudulent statements.

*New Business.*    Finally, 5 Guys argues that the PPM and Defendants' associated communications described the GLHM dispensary as a "new" business, even though Redbud had already been operating the dispensary prior to 5 Guys' investment.  Because the Court finds that 5 Guys cannot establish loss causation as to these representations (*see infra* Section III.B.3(c)), it is unnecessary to determine whether the representations were fraudulent.

In sum, 5 Guys has established a genuine dispute as to whether Defendants intentionally made fraudulent statements.

### (b) Reasonable Reliance

Defendants also contend that 5 Guys cannot establish reasonable reliance on Defendant's allegedly fraudulent statements.  Specifically, Defendants argue that the PPM contained a provision disclaiming reliance on prior statements, and that 5 Guys did not comply with the PPM's requirements for buying stock and knew that the transaction was not complete when they wired the money.

First, the non-reliance clause.  The PPM stated that "[n]o person has been authorized to give any information or to make any representation in connection with the offer made by this Memorandum . . . and if given or made, such information or representations must not be relied upon."  (PPM 16.)  5 Guys' fraud claims rest primarily on statements in the PPM, which are unaffected by this disclaimer.  The only claims that would be directly impacted by this clause are those against Fanta for his pre-PPM representations that 5 Guys' investment would go to GLHM, and that the Muskegon dispensary was new.  But the Sixth Circuit has held that a non-reliance clause does not automatically defeat a 10b-5 claim; rather, such a clause is only one factor to consider in determining whether a plaintiff's reliance was reasonable.  *See Brown v. Earthboard*

28

*Sports USA, Inc.*, 481 F.3d 901, 921 (6th Cir. 2007) (defendant was not entitled to summary judgment on issue of reasonable reliance despite non-reliance clause).  Under the circumstances—namely, that Fanta's allegedly fraudulent statements were confirmed by the PPM itself—a jury could find that 5 Guys' reliance on those statements was reasonable.

Given the similarities between Rule 10b-5 and the MUSA, the Court presumes that the impact of a non-reliance clause is the same for claims under both statutes.  Even if the Court were to instead apply Michigan's common law principles regarding non-reliance clauses in fraud cases to 5 Guys' MUSA claims, the result would be the same.  A non-reliance clause bars only fraud claims based on promises made by a defendant that were not included in the contract at issue—thus, the clause prevents a plaintiff from "introduc[ing] new or different contract terms" not contained in the written contract.  *Jenson v. Gallagher*, No. 312739, 2014 WL 667790, at *5 (Mich. Ct. App. Feb. 18, 2014).  On the other hand, a non-reliance clause does not prevent a plaintiff from asserting fraud based on "collateral factors that have a legal operation of their own," such as misleading factual statements by a defendant.  *Id.*  Fanta's representation that the dispensary was new is a misleading factual statement, not a contractual term, so a claim based on that representation is not barred by the non-reliance clause.  And both of Fanta's fraudulent statements were reiterated by the PPM, so they were not "new or different contract terms."  Thus, the non-reliance clause does not bar any of 5 Guys' claims.

Second, it is true that 5 Guys did not comply with all the requirements of the PPM.  For example, they wired the money instead of submitting cash or a certified check, and they did not submit the investor questionnaire or subscription agreement.  (*See* PPM 18.)  But the PPM instructed potential investors to contact Leonowicz for information related to payment (*id.*), and when 5 Guys asked Leonowicz for wiring instructions, he provided them.  It was not necessarily

29

unreasonable for 5 Guys to interpret Leonowicz's acceptance of its payment as a waiver of the requirements in the PPM.  Similarly, even though 5 Guys should have known that the transaction had not been completed when it submitted the payment, Leonowicz appeared to treat the payment as an acceptance of the investment terms proposed by the PPM.  It was thus not necessarily unreasonable for 5 Guys to assume that Defendants would subsequently abide by those terms.

Finally, because 5 Guys cannot establish loss causation as to the representations that GLHM was a new business, it is unnecessary to address reliance as to those representations.

### (c) Loss Causation

Defendants also argue that 5 Guys cannot show loss causation for any of its fraud claims.  "In a securities action, the plaintiff bears the burden of proving loss causation," which "requires a causal connection between the material misrepresentation and the loss."  *Ind. State Dist. Council of Laborers & Hod Carriers Pension & Welfare Fund v. Omnicare, Inc.*, 583 F.3d 935, 944 (6th Cir. 2009).  It is not enough to show "transaction causation," i.e., "that had [the plaintiff] known the truth, they would not have invested in the defendants' venture."  *Clayton v. Heartland Res., Inc.*, 754 F. Supp. 2d 884, 893 (W.D. Ky. 2010).  A plaintiff must also show that the fraudulent statement was "the 'proximate cause' of an investment loss," meaning that "risk that caused the loss was within the zone of risk *concealed* by the misrepresentations and omissions alleged by a disappointed investor."  *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 830 F.3d 376, 384 (6th Cir. 2016).  To put it another way, "'[l]oss causation' means that the investor would not have suffered a loss if the facts were what he believed them to be."  *Rankow v. First Chicago Corp.*, 870 F.2d 356, 367 (7th Cir. 1989).[19]

---

[19] Some courts have suggested that it is unnecessary to establish loss causation when the plaintiff alleges that the defendant's fraud caused them to make an investment they otherwise would not have made—rather than merely alleging that the fraud caused the price of stock to be inflated.  *See, e.g.*, *Hatrock v. Edward D. Jones & Co.*, 750 F.2d 767, 773 (9th Cir. 1984); *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 223 (3d Cir. 2006).  However, the Court

5 Guys can establish loss causation as to some but not all of the alleged misrepresentations. First, 5 Guys has made a sufficient showing that the misrepresentation regarding how its investment would be used caused it a loss.  There is some evidence that the dispensary was unsuccessful due to a lack of cash flow.  (*See* Ownbey Dep. 143.)  Furthermore, if 5 Guys' $1.5 million investment had gone to GLHM, then the company would likely have had more assets when it was sold, producing a higher payout for 5 Guys.  Second, 5 Guys has sufficiently established loss causation as to the 10% revenue cut.  If Defendants took more than their proportionate share of stock distributions, 5 Guys in turn received less in distributions than it otherwise would have. And again, there is evidence that the revenue cut hindered the dispensary's operations as a whole and contributed to its eventual failure.  (*See id.*)

However, 5 Guys has *not* made a sufficient showing that the representations that the Muskegon dispensary was "new" caused it any loss.  Loss causation would be satisfied here if 5 Guys showed that the dispensary ultimately failed under the new ownership for the same reason it failed under the prior ownership, and thus the facts concealed by Defendants were the ultimate cause of 5 Guys' lost investment.  But 5 Guys does not point to any evidence that would link the dispensary's pre-investment failure to its post-investment failure.  Thus, there is no genuine dispute as to whether these representations caused a loss.

### 4. Common Law Fraud

5 Guys also brings claims under Michigan law for fraudulent misrepresentation, innocent misrepresentation, and silent fraud.  Defendants' objections to these claims are primarily the same

---

finds such a blanket rule to be unpersuasive and contrary to the basic concept of loss causation, which requires that the fraud was not just "the cause of the[ plaintiff] entering into the transaction in which they lost money but [also] the cause of the transaction's turning out to be a losing one."  *Bastian v. Petren Res. Corp.*, 892 F.2d 680, 684 (7th Cir. 1990).  The rule expressed in *Hatrock* and *Berckeley* is applicable only where a defendant fraudulently induces a plaintiff to buy a stock that is completely worthless; in that case, proving loss causation is unnecessary because it is obvious that the loss was caused by the fraud.  *See Nolfi v. Ohio Ky. Oil Corp.*, 675 F.3d 538, 549–50 (6th Cir. 2012).

as those raised in response to the securities fraud claims.  The Court resolves most of those objections in the same way as it did above.

As to 5 Guys' fraud claims regarding the representation that GLHM was a new dispensary, the Court will again grant summary judgment to Defendants based on a failure to establish loss causation.  The loss causation doctrine is specific to the securities context, and the Michigan Court of Appeals has declined to address whether it applies equally to a common law fraud claim.  *Brian M. Kelly Tr. v. Adkison, Need, Green & Allen, PLLC*, No. 268550, 2007 WL 708598, at \*7 (Mich. Ct. App. Mar. 8, 2007), *rev'd in part on other grounds*, 739 N.W.2d 622 (Mich. 2007).  But in the same case, the court acknowledged that "what securities lawyers call 'loss causation' is the standard common law fraud rule . . . merely borrowed for use in federal securities fraud cases." *Id.* at \*6 (quoting *Bastian v. Petren Res. Corp.*, 892 F.2d 680 (7th Cir. 1990)).  Given that loss causation is essentially a form of proximate causation, *see Ohio Pub. Emps.*, 830 F.3d at 384, 5 Guys' failure to show loss causation as to this particular misrepresentation entails that it cannot show proximate cause and thus that it cannot establish a common law fraud claim.  *See also* Restatement (Third) of Torts: Liability for Economic Harm § 12 cmt. a (A.L.I. 2020) ("[N]o liability results when a defendant's lie causes the plaintiff to make an investment that fails for reasons entirely unrelated to what the defendant said.").

In addition to the arguments Defendants raised against 5 Guys' securities fraud claims, they bring additional arguments regarding the common law fraud claims, which are addressed below.  As the Court will explain, Defendants are entitled to summary judgment on the innocent misrepresentation claims but not the fraudulent misrepresentation and silent fraud claims.  Additionally, Redbud is entitled to summary judgment on all three common law claims.

### (a) Contractual Promises

As an initial matter, Defendants contend that 5 Guys cannot bring a common law fraud claim based on fraudulent promises contained in the PPM.  "In general, actionable fraud must be predicated on a statement relating to a past or an existing fact."  *Custom Data Sols., Inc. v. Preferred Cap., Inc.*, 733 N.W.2d 102, 104 (Mich. Ct. App. 2006) (cleaned up).  But a plaintiff may bring a claim for fraud in the inducement when the defendant "materially misrepresents *future* conduct under circumstances in which the assertions may reasonably be expected to be relied upon and are relied upon."  *Id.* at 104–05 (emphasis added); *accord Rutan v. Straehly*, 286 N.W. 639, 642 (Mich. 1939).  That rule squarely applies here, as 5 Guys argues that Defendants made promises they had no intention of keeping.

Defendants object that Michigan law generally does not permit a fraud in the inducement claim based on a defendant's failure to abide by a promise contained within a contract, *see Newman v. Roland Mach. Co.*, No. 2:08-cv-185, 2009 WL 1438531, at *4–5 (W.D. Mich. May 19, 2009), even if the defendant made the promise without an intent to perform it, *see Gen. Motors Corp. v. Alumi-Bunk, Inc.*, 757 N.W.2d 859, 860 (Mich. 2008) (Young, J., concurring).  The justification for that principle is that if a plaintiff could always bring a fraud claim instead of a breach of contract claim, "contract law would drown in a sea of tort."  *Neibarger v. Universal Coops., Inc.*, 486 N.W.2d 612, 618 (Mich. 1992).  That justification has no relevance here, where Defendants were not contracting parties and 5 Guys cannot sue them for breach of contract.  Because fraud claims are the only avenue to redress its injuries, the Court finds that 5 Guys may bring such claims based on Defendants' promises in the PPM.

### (b) Burden of Proof

Defendants next argue that under Michigan law, a plaintiff must establish fraud by clear and convincing evidence.  *See, e.g.*, *Foodland Distribs. v. Al-Naimi*, 559 N.W.2d 379, 381 (Mich.

33

Ct. App. 1996).  Admittedly, Michigan courts have been somewhat inconsistent on this point.  *See Mina v. Gen. Star Indem. Co.*, 555 N.W.2d 1, 4 (Mich. Ct. App. 1996) ("[W]e are unable to say with any degree of certainty exactly what standard of proof courts should apply in fraud cases."), *rev'd in part on other grounds*, 568 N.W.2d 80 (Mich. 1997).  But recent case law supports the principle that when a plaintiff brings a fraud claim (rather than raising fraud as a defense) they must establish fraud by clear and convincing evidence.  *See Smith Living Tr. v. Erickson Ret. Cmtys.*, 928 N.W.2d 227, 240 (Mich. Ct. App. 2018) ("Fraudulent inducement must be proved by clear and convincing evidence."); *Allstate Ins. Co. v. Maroki*, No. 230051, 2002 WL 31117182, at *2 (Mich. Ct. App. Sept. 24, 2002) (distinguishing between cases involving fraud claims and fraud defenses).  In addition, this Court is bound by Sixth Circuit precedent stating that "[u]nder Michigan law, fraud must be established by clear and convincing evidence." *APJ Assocs., Inc. v. N. Am. Philips Corp.*, 317 F.3d 610, 615 (6th Cir. 2003).[20]

"In ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Liberty Lobby*, 477 U.S. at 254.  Because 5 Guys must ultimately prove its common law fraud claims by clear and convincing evidence, to avoid summary judgment it must establish that a reasonable jury could find for it on each element of its claims by clear and convincing evidence.  *Id.* at 244.  This burden of proof only affects the Court's findings on one issue—the involvement of Redbud in the allegedly fraudulent scheme.  As explained above, a reasonable jury could find that Redbud directed Leonowicz's and Fanta's allegedly fraudulent actions—and therefore is liable for securities fraud—because Leonowicz and Fanta ultimately redirected the money to Redbud.  However, the Court is not persuaded that a

---

[20] The clear and convincing standard only applies to 5 Guys' common law fraud claims; fraud claims under 10b-5 are evaluated using a preponderance of the evidence standard.  *Herman & MacLean v. Huddleston*, 459 U.S. 375, 390–91 (1983).  And in the absence of any case law applying a clear and convincing standard to MUSA claims, the Court interprets the MUSA in alignment with federal securities law.

reasonable jury could find that Redbud was involved *by clear and convincing evidence*. The circumstantial evidence of Redbud's role in the alleged fraud is simply not strong enough to meet such a burden. Therefore, the Court will grant Redbud summary judgment as to the common law fraud claims.

*    *    *

Having addressed those general objections, the Court now turns to 5 Guys' specific common law fraud claims.

### (c) Fraudulent Misrepresentation

A fraudulent misrepresentation claim overlaps significantly with a securities fraud claim. Michigan courts have explained that

> [t]o establish a prima facie claim of fraudulent misrepresentation, a plaintiff must prove (1) the defendant made a material representation; (2) the representation was false; (3) when the defendant made the representation, the defendant knew that it was false, or made it recklessly, without knowledge of its truth or falsity, and as a positive assertion; (4) the defendant made the representation with the intention that the plaintiff would act on it; (5) the plaintiff acted in reliance on the representation; and (6) the plaintiff suffered damage.

*Derderian v. Genesys Health Care Sys.*, 689 N.W.2d 145, 155–56 (Mich. Ct. App. 2004). Defendants' objections to 5 Guys' fraudulent misrepresentation claims are essentially identical to their objections to the securities law claims, and the Court will resolve them in the same way. Thus, 5 Guys may proceed with their fraudulent misrepresentation claims against only Leonowicz and Fanta.

### (d) Silent Fraud

5 Guys also brings claims for silent fraud. "[S]ilence cannot constitute actionable fraud unless it occurred under circumstances where there was a legal duty of disclosure." *M&D, Inc. v. W.B. McConkey*, 585 N.W.2d 33, 37 (Mich. Ct. App. 1998) (emphasis omitted). Defendants argue that they had no duty to disclose any of the information they allegedly failed to provide, such as

35

their intended use of the investment or their 10% revenue cut.  However, although Defendants may not have had a duty to disclose that information in the abstract, such a duty can be created when a person knowingly makes a misleading representation.  *See Roberts v. Saffell*, 760 N.W.2d 715, 720 (Mich. Ct. App. 2008) ("[F]or silent fraud, the plaintiff must prove that the defendant knew of a material fact but concealed or suppressed the truth through false or misleading statements or actions and with the intent to deceive."); *M&D, Inc. v. W.B. McConkey*, 585 N.W.2d 33, 39 (Mich. Ct. App. 1998) ("The gist of the [silent fraud] action is fraudulently producing a false impression upon the mind of the other party." (emphasis removed)).

Defendants argue that "there is no duty to disclose in an ordinary contract setting except when a party is responding to a specific inquiry." *Mercurio v. Huntington Nat'l Bank*, 16 N.W.3d 748, 761 (Mich. Ct. App. 2023).  But the Court does not read Michigan case law as establishing a bright-line rule that a duty to disclose never arises unless a plaintiff asks a specific question.  Rather, a plaintiff's inquiry is simply one way that a defendant can be put on notice of their need to clarify the plaintiff's misapprehension.  If a defendant states a half-truth that they know has misled the plaintiff as to an issue the plaintiff cares about, the defendant can acquire a duty to disclose even if the initial half-truth was not in response to an inquiry.  *Cf. Mamat v. Robinson Realty & Mgmt. Grp., Inc.*, No. 374590, 2026 WL 1361901, at *4 (Mich. Ct. App. May 14, 2026) ("[A] seller's agent may have a duty to disclose newly acquired information that is recognized by the agent as rendering a prior affirmative statement untrue or misleading." (internal quotation marks omitted)).  Here, given that there is a genuine issue of fact as to whether Defendants' statements were fraudulent in and of themselves, there is also a genuine issue as to whether Defendants' statements created a concomitant duty to clarify the truth—the violation of which would constitute silent fraud.

### (e) Innocent Misrepresentation

Finally, 5 Guys brings claims for innocent misrepresentation.  "A claim of innocent misrepresentation is shown where a party detrimentally relies on a false representation in such a manner that the injury inures to the benefit of the party making the misrepresentation." *Roberts*, 760 N.W.2d at 720.  Innocent misrepresentation is in some respects easier to establish than intentional misrepresentation because "[i]t is unnecessary to prove that the party making the representation had knowledge that it was false." *Id.*  However, "for liability under a theory of innocent misrepresentation to arise there must be privity of contract between the party making the representation and the party claiming to have detrimentally relied on it." *Id.*  Here, as discussed above, none of Defendants were parties to the PPM.  Thus, 5 Guys was not in privity of contract with Defendants and cannot bring an innocent misrepresentation claim.

### 5. Conversion

5 Guys also brings common law and statutory conversion claims.  Conversion "consists of any distinct act of domain wrongfully exerted over another's personal property in denial of or inconsistent with the rights therein." *Dep't of Agric. v. Appletree Mktg., LLC*, 779 N.W.2d 237, 244 (Mich. 2010).  5 Guys contends that Defendants converted the investment by taking it for their own use.  But no conversion claim lies because once 5 Guys transmitted the money to Defendants, it was no longer 5 Guys' property.  5 Guys points out that "[c]onversion may occur when a party properly in possession of property uses it in an improper way," *id.*, such as when a defendant is authorized to use the plaintiff's property for some specific purpose but uses it for a different end. *See* Restatement (Second) of Torts § 228 (A.L.I. 1965).  But this principle only applies when a defendant is authorized to use property that still belongs to the plaintiff.  If a plaintiff transfers title to the property, a defendant cannot commit conversion by using it for an improper purpose.  Here,

5 Guys surrendered title to the money when it executed the wire transfer, and at that point the money could no longer be converted.

In sum, the Court will grant summary judgment to Defendants on 5 Guys' conversion claims.

### C. Piercing the Corporate Veil

Finally, Fanta and Leonowicz argue that 5 Guys may not pierce the corporate veil to hold them liable for acts committed by Redbud. To pierce the corporate veil, a plaintiff

> must establish that (1) the entity was the mere instrumentality of the owner, (2) the owner exercised his or her control in such a manner as to defraud or wrong the complainant in some way, and (3) the complainant would suffer an unjust loss or injury unless the court disregards the existence of the entity as separate from its owner.

*Green v. Ziegelman*, 873 N.W.2d 794, 805 (Mich. Ct. App. 2015). The Court agrees with Defendants that 5 Guys has not pointed to any evidence demonstrating that Redbud was the mere instrumentality of Fanta and Leonowicz. 5 Guys argues that the individual Defendants exercised control over Redbud, but control is normal for a corporate owner and is not itself sufficient to establish that the corporation was a mere instrumentality. 5 Guys also argues that Defendants transferred its investment to Redbud in order to personally enrich themselves, but there is no evidence of this fact in the record. As discussed above, a jury could find that Defendants redirected the money for Redbud's use, but not that they transferred it from Redbud to their personal accounts. Thus, 5 Guys has not established its entitlement to pierce the corporate veil and impute Redbud's liability to the individual Defendants.

Of course, this conclusion does not mean that Fanta and Leonowicz cannot be held liable for their own torts. Rather, it entails that establishing Redbud's liability as to a given claim will not allow 5 Guys to directly recover from the individual Defendants; to do that, 5 Guys must succeed on its claims against the individuals.

## IV. CONCLUSION

For the reasons explained above, the Court will grant summary judgment to all Defendants on 5 Guys' innocent misrepresentation, conversion, breach of fiduciary duty, and minority shareholder oppression claims; to Redbud on 5 Guys' state common law claims; and to Lab VIII on all claims.  The remaining claims are those for federal and state securities fraud against Fanta, Leonowicz, and Redbud, and for fraudulent misrepresentation and silent fraud against Fanta and Leonowicz.

An order will enter consistent with this Opinion.

Dated: July 2, 2026            /s/ Hala Y. Jarbou
                               HALA Y. JARBOU
                               CHIEF UNITED STATES DISTRICT JUDGE